IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH GARDI | ) | CASE NO: |
| 375 Strawberry Lane | ) | |
| Medina, Ohio 44256 | ) | |
| | ) | |
| Plaintiff | ) | JUDGE |
| | ) | |
| vs. | ) | MAG. JUDGE |
| | ) | |
| HCA PLAN ADMINISTRATION COMMITTEE | ) | **PLAINTIFF'S COMPLAINT** |
| "Plan Administrator" | ) | |
| c/o HCA, Inc. | ) | |
| One Park Plaza, 1-2W | ) | |
| Nashville, TN 37203 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| HCA, Inc. | ) | |
| One Park Plaza, 1-2W | ) | |
| Nashville, TN 37203 | ) | |
| | ) | |
| And | ) | |
| | ) | |
| UNITED HEALTH CARE SERVICES, INC. | ) | |
| c/o CT Corporation System | ) | |
| 4400 Easton Commons Way, Suite 125 | ) | |
| Columbus, Ohio 43219 | ) | |
| | ) | |
| Defendants. | ) | (Jury Demand Endorsed Hereon) |

Plaintiff Joseph Gardi brings this action against Defendant HCA Plan Administration Committee, Defendant HCA, Inc. and Defendant United Healthcare Services, Inc. ("United") for benefits owed under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA").

## NATURE OF THE ACTION

1. Plaintiff is a long-time beneficiary of the HCA Health and Welfare Benefits Plan (the "Plan"). In 2015, he was diagnosed with numerous chronic medical conditions, including neurotoxicity of the brain and common variable immune deficiency ("CVID"). These conditions compromise Plaintiff's immune system and render him susceptible to contracting infections. Without medical intervention, toxins accumulate and the pathogens in Plaintiff's body multiply, causing organ failure.

2. Plaintiff's conditions are treatable with well-established medical interventions. Regular infusions of vitamins and minerals, intravenous injections of immunoglobulin, hyperbaric treatment, and other therapies can help Plaintiff's body to keep infections at bay. Recognizing as much, Defendant HCA Plan Administration Committee, Defendant HCA, Inc. and Defendant United Healthcare Services, Inc. ("United") for years routinely processed, approved and/or paid claims for Plaintiff's medical treatments in its capacity as a plan administrator, a *de facto* plan administrator and/or a claim administrator for the Plan.  During that time, these treatments contained Plaintiff's infections and allowed him to live a relatively normal life despite his disability.

3. In 2018, Defendants suddenly and inexplicably changed course. Instead of approving and paying the claims for benefits submitted by Plaintiff's healthcare providers, Defendants denied claims submitted by those same providers to treat the same conditions. Defendants issued denial after denial, ultimately denying hundreds of claims submitted over the course of at least a year. But although Defendants eventually reconsidered and paid many of those claims, the damage was done: Without any way to pay his doctors, Plaintiff had already foregone the medically necessary treatments those doctors had ordered causing him irreparably harm.

4. As a direct result of Defendants' misconduct, Plaintiff's health deteriorated rapidly as toxins built up and pathogens ravaged his body. He wound up in the emergency room twice in 2018. He was forced to move to Ohio to be nearer to his elderly parents and grandfather, who now care for him. And Plaintiff requires constant care. He is completely disabled and spends his days receiving treatment at various healthcare providers. He struggles with everyday tasks like walking and showering. Internally, Plaintiff has suffered brain swelling and neurological damage. He is dependent on colonics to process waste (and therefore survive). His Hepatitis C infection, which had become undetectable for a time, has reemerged. In short, Plaintiff's body is failing,

5. This was preventable. Had Defendants not arbitrarily and in bad faith denied Plaintiff's claims for benefits—which Defendants had already determined were covered by the Plan and many of which later paid—Plaintiff could still be living independently. He might even be able to work. The catastrophic losses that Plaintiff has suffered stem directly from Defendants' gross misconduct as a plan administrator, *de facto* plan administrator, and/or claim administrator and fiduciaries of the Plan. Through this action, Plaintiff seeks to recover the outstanding benefits that are still owed. Such relief will be cold comfort to Plaintiff, who cannot fully or truly be made whole from Defendants' unconscionable misconduct.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction over this action because it arises under the laws of the United States. 28 U.S.C. § 1331.

7. Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred here. 28 U.S.C. § 1391. Venue is also proper under the nationwide venue provision of ERISA. 29 U.S.C. §1132(e)(2).

## PARTIES

8. Plaintiff Joseph Gardi is an individual who resided in this district since August 2018, when he was forced to move to Ohio from Florida.

9. On information and belief, Defendant HCA Plan Administration Committee is the Plan Administrator and primary payer of the Plan with its principal place of business in Nashville, Tennessee.

10. On information and belief, Defendant HCA, Inc. is the *de facto* Plan Administrator and primary payer of the Plan with its principal place of business in Nashville, Tennessee.

11. On information and belief, Defendant United is a healthcare company with its principal place of business in Minnesota. United conducts business nationwide, including in this district.

## GENERAL ALLEGATIONS

12. Plaintiff is and was at all relevant times a beneficiary of the Plan. A copy of the Summary Plan Description ("SPD") for the Plan is attached as Exhibit A to this Complaint.

13. On information and belief, Defendant HCA Plan Administration Committee is the Plan Administrator. Defendant HCA, Inc. is the *de facto* Plan Administrator. These defendants are responsible for administration and payment of claims of the Plan.

14. On information and belief, Defendant United is a Claims Administrator for the Plan. On information and belief, Defendant United is the Claims Administrator responsible for handling all claims for medical benefits submitted to the Plan.

15. The Plan distinguishes among four types of claims for medical benefits: (1) urgent care claims, (2) concurrent care claims, (3) pre-service claims, and (4) post-service claims. It defines each type of claim as follows:

**Urgent care claims:** Are claims for medical care or treatment for which using the time periods for making non-urgent care determinations could seriously jeopardize the life or health of the claimant or the claimant's ability to regain maximum function, or – in the opinion of a physician with knowledge of the claimant's medical condition – would subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim

**Concurrent care claims**: Are claims related to an approved, ongoing course of treatment over a period of time or number of treatments

**Pre-service claims**: Are claims for medical benefits for which the plan requires prior approval of the benefit before you receive medical care

**Post-service claims:** Are claims for health benefits that are not pre-service or urgent care claims

Exhibit A at 154-55.

16. On information and belief, claims at issue in this Complaint are urgent care claims, concurrent care claims, and/or pre-service claims within the meaning of the Plan. The claims are urgent care claims because using the time periods for making non-urgent care determinations could (and did) seriously jeopardize the life or health of Plaintiff or Plaintiff's ability to regain maximum function. The claims are also concurrent care claims because they are related to an approved, ongoing course of treatment over a number of treatments. And the claims are pre-service claims because the plan required prior approval of the benefit before Plaintiff received medical care.

17.  In its capacity as Plan Administrator and/or *de facto* Plan Administrator, Defendants HCA Plan Administration Committee and/or HCA, Inc. exercise control over the Plan's administration including, but not limited to, payment of claims.

**For Years, Defendants Routinely Processed And Paid Claims For Medically Necessary Treatments For Plaintiff's Serious Medical Conditions.**

18. About nine years ago, Plaintiff began to experience recurrent and chronic respiratory infections. About two years later, he noticed significant neurocognitive deterioration, including visual hallucinations and brain fog. As his symptoms worsened, Plaintiff consulted various doctors. In 2015, physicians at the Environmental Health Center finally diagnosed Plaintiff with multiple serious medical conditions, including neurotoxicity of the brain and CVID.

19. Neurotoxicity occurs when exposure to toxic substances alters the normal activity of the nervous system. Symptoms may include weakness or numbness, loss of memory, vision, or intellect, and cognitive and behavioral problems.[1] On information and belief, neurotoxicity has been found to be a major cause of neurogenerative diseases, such as dementia/Alzheimer's disease.

20. CVID is an antibody deficiency that impairs the immune system. People with CVID are susceptible to recurrent infections, which can lead to chronic lung disease, diarrhea and weight loss, and other symptoms.[2] On information and belief, CVID is one of the most common forms of primary immunodeficiency disease, and its severity varies among patients.

21. Plaintiff's conditions impair his body's ability to absorb essential nutrients and to rid itself of toxins. Without regular medical intervention, toxins accumulate in his body and can cause irreversible harm.

22. Plaintiff's conditions also render him susceptible to contracting infections. Without regular medical intervention, the pathogens already in his body multiply, and new pathogens

---

[1] See National Institute of Neurological Disorders and Stroke, Neurotoxicity Information Page, https://www.ninds.nih.gov/Disorders/All-Disorders/Neurotoxicity-Information-Page (last visited April 22, 2020).
[2] See U.S. National Library of Medicine, Common Variable Immune Deficiency, https://ghr.nlm.nih.gov/condition/common-variable-immune-deficiency#resources (last visited April 22, 2020).

invade. These pathogens can cause irreversible harm. Plaintiff has contracted a variety of serious infections since 2012, including at least a staph infection and Hepatitis C.

23. Plaintiff's conditions are severe and have rendered him disabled since 2014. But for a time following his diagnosis in 2015, Plaintiff's health slowly improved with the help of regular medical interventions prescribed by his doctors.

24. Indeed, Plaintiff's conditions are treatable with well-established medical interventions. These interventions include but are not limited to vitamins and minerals intravenous therapy and chelation ("Vitamins and Minerals Therapy"), octagam immunoglobulin intravenous treatment ("IGG Therapy"), and hyperbaric oxygen therapy ("Hyperbaric Therapy").

25. Plaintiff began to receive regular Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy in Florida in 2015. From the time of his diagnosis in 2015 until late 2017, Defendants routinely processed and paid claims for Plaintiff's regular Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy.

26. On information and belief, Defendants possessed records establishing Plaintiff's multiple serious medical conditions and the medical necessity for regular Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy since 2015. On information and belief, Defendants have known that the Plan covers Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy for Plaintiff since 2015.

27. On information and belief, Defendants have known or should have known since 2015 that without regular medical intervention, toxins would accumulate in Plaintiff's body and could cause irreversible harm. On information and belief, Defendants have also known or should have known since 2015 that without regular medical intervention, pathogens already in Plaintiff's body

would multiply and new pathogens would invade, making Plaintiff sicker and more disabled and potentially causing irreversible harm.

28. From the time of his diagnosis in 2015 until late 2017, Plaintiff was able to live a relatively normal life despite his disability. He lived independently in Florida. His physicians believed that his regular Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy were working. For a time, Plaintiff's Hepatitis C became undetectable.

**In 2018, Defendants Suddenly And Inexplicably Stopped Processing And Paying Plaintiff's Claims, Causing Plaintiff To Forego Medically Necessary Treatments.**

29. In around January 2018, Defendants' approach to handling Plaintiff's claims changed dramatically. Instead of processing and paying claims in the ordinary course, Defendants denied claims submitted by those same providers to treat the same conditions. On information and belief, there were no material changes in the Plan, in Plaintiff's condition, or in any other relevant factor that could possibly have justified treating Plaintiff's claims differently as of 2018. On information and belief, Defendants knew or should have known that the claims were covered by the Plan, and that failing to process and pay them in the ordinary course could cause catastrophic harm to Plaintiff.

30. For example, between approximately 2015 and 2017, Defendants routinely reimbursed Plaintiff for Vitamins and Minerals Therapy provided by Balance Health and Wellness Centers in Palm Beach Gardens. But on or about January 31, 2018, Defendants sent a letter to Plaintiff denying coverage for Vitamins and Minerals Therapy. Defendants cited an exclusion for "Care, treatment, services or supplies that are not prescribed, recommended and approved by the attending physician or dentist." Of course, Defendants have known for years that Vitamins and Minerals Therapy had been "prescribed, recommended and approved by the attending physician or dentist" to treat Plaintiff's medical conditions. On information and belief, Balance Health and Wellness

8

Centers exhausted the Plan's internal appeal process, but Defendants upheld its denial. Unable to pay for regular Vitamins and Minerals Therapy out-of-pocket, Plaintiff had no choice but to forego medically necessary Vitamins and Minerals Therapy for much of 2018.

31. Defendants behaved even more capriciously with respect to Plaintiff's IGG Therapy. Between approximately 2015 and mid-2018, Defendants routinely processed and paid claims for IGG Therapy dispensed to Plaintiff by Diplomat Specialty Pharmacy. But Defendants suddenly and inexplicably failed to authorize Plaintiff's IGG Therapy in around July 2018. On information and belief, when Plaintiff appealed the denial, Defendants reconsidered and pre-authorized Plaintiff to receive IGG Therapy for about three months, through mid-October 2018. Defendants then processed and paid claims for IGG Therapy between August 3, 2018 and August 9, 2018. But on information and belief, Defendants then denied claims for IGG Therapy submitted after August 9, 2018—claims that Defendants had specifically preauthorized—on the grounds that Medicare was the primary payor. Later in 2018, Defendants denied claims for IGG Therapy on the different but equally specious grounds that it required additional blood tests. Unable to pay for regular IGG Therapy out-of-pocket, Plaintiff had no choice but to forego medically necessary IGG Therapy in late 2018.

32. Defendants' assertion that Medicare was the primary payor for Plaintiff's claims—an assertion that it would repeat hundreds of times over the following months—was utterly baseless. It is true that as a result of his disability, Plaintiff is and was eligible to participate in Medicare Part A as of mid-2016. Medicare Part A generally covers inpatient hospital stays, skilled nursing care, hospice care, and limited home healthcare services. But as Defendants knew, Plaintiff is not eligible to participate in Medicare Part B because he is under 65 years of age. Medicare Part B generally covers outpatient medical care, including professionally administered prescriptions.

33. As Defendants knew or should have known, Medicare was not and could not be the primary payor for Plaintiff's Vitamins and Minerals Therapy, IGG Therapy, or Hyperbaric Therapy because Medicare Part A does not cover those services at all. Any Medicare coverage for those claims would fall under Medicare Part B, for which Defendants knew or should have known Plaintiff was ineligible. Nothing in either the Plan or federal law makes Medicare a primary payor when a Plan participant or beneficiary is ineligible for the relevant Part.

34. On information and belief, Plaintiff's medical providers and/or prior counsel repeatedly explained to Defendants that Medicare was not and could not be the primary payor for the relevant claims. Defendants falsely told several of Plaintiff's medical providers that Plaintiff was Medicare-eligible because he had contracted End-Stage Renal Disease ("ESRD"). Defendants knew or should have known that Plaintiff did not have and never has had ESRD.

35. On information and belief, Defendants denied hundreds of claims on the baseless grounds that Medicare was a primary payor even though it knew that Medicare was not in fact the primary payor. Defendants' own representatives acknowledged in numerous telephone calls that the "Medicare as primary payor" denial was wrong. For example, on or about October 10, 2018, United representative "Joanne" acknowledged that Medicare was not the primary insurance, and she promised that any claims denied on that basis would be reprocessed. Similarly, on or about the following day, United representative "Margaret" again acknowledged that the Plan was Plaintiff's primary insurer, not Medicare. Yet Defendants continued to deny Plaintiff's claims on the basis that Medicare was the primary payor well into 2019 at least.

36. The pattern recurred with Plaintiff's Hyperbaric Therapy. Between approximately 2015 and 2018, Defendants routinely processed and paid claims for Hyperbaric Therapy rendered by Cralle Physical Therapy and ORCCA Hyperbaric in Florida. When Plaintiff was forced to move

to Ohio, Defendants preauthorized Hyperbaric Therapy to be rendered by another provider, Hyperbaric Therapy of Brook Park. But Defendants then denied its claims, again citing the Medicare coverage exclusion. On information and belief, when Hyperbaric Therapy of Brook Park appealed those denials, Defendants reconsidered and paid many but not all of the submitted claims months later. But the damage was done. In October of 2018, Defendants reversed course and started paying at a Medicare rate and/or an "out-of-network" rate, damaging Plaintiff. Unable to pay for regular Hyperbaric Therapy out-of-pocket, Plaintiff had no choice but to forego medically necessary Hyperbaric Therapy.

37. All told, Defendants arbitrarily, recklessly, and in bad faith denied hundreds of claims for medically necessary treatment rendered to Plaintiff over the course of well over a year. Although Defendants eventually reconsidered and paid many of these claims, Plaintiff is informed and believes that there are numerous outstanding unpaid claims for covered Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy. In addition, as set forth in greater detail below, Defendants' gross misconduct in handling Plaintiff's claims caused extraordinary losses that would not be adequately remedied by paying Plaintiff the benefits that are still owed.

38. Incredibly, even after Plaintiff brought the instant litigation, Defendants have continued to arbitrarily and in bad faith deny his claims or requests for pre-authorization for medically necessary treatments. For example, Defendants denied claims for medically necessary lymphatic drainage therapy ("Massage Therapy") on the grounds that the rendering provider is unlicensed, when a simple search on Ohio's license website shows that she is in fact licensed. A copy of the Ohio License Look Up for Ellison Rebecca Rainsberger is attached as Exhibit B to this Complaint. United has also refused to preauthorize new IGG Therapy on the grounds that it is not "medically necessary," even though United has for years recognized that IGG Therapy is medically necessary

for Plaintiff. More generally, Defendants' pattern and practice of misconduct in handling Plaintiff's claims (losing them, paying the wrong amount, paying the wrong person, paying late, and denying them for reasons that Defendants know to be false) continues unabated to this day.

39. Plaintiff is informed and believes that his medical providers and/or prior counsel have exhausted the Plan's internal appeal process for all outstanding unpaid claims. To the extent that there are any outstanding claims for which the internal appeal process has not been exhausted, any failure to exhaust is excused by Defendants' claims administration and handling misconduct, Defendants' refusal to provide prior counsel the information she repeatedly requested about the Plan's administrative remedies, and by Plaintiff's failing health, which placed the administrative remedies of the Plan effectively out of reach.

### In 2021, Defendants Again Suddenly And Inexplicably Stopped Processing And Paying Plaintiff's Claims, Causing Plaintiff To Forego Medically Necessary Treatments.

40. In July of 2020, Plaintiff's physician, Dr. Elizabeth Seymour, prescribed an IGG brand known as Panzyga. Plaintiff's medically necessary treatment of IGG was originally approved for 6 months from July 23, 2020 to January 23, 2021.

41. On or about March 16, 2021, Defendant United contacted Plaintiff's provider, Environment Health Center, indicating that Defendants wanted to change the IGG brand from Panzyga to a less expensive IGG brand. Further, Defendants declared that Plaintiff's Panzyga would no longer be authorized.

42. As a result of Defendants sudden denial of Plaintiff's Panzyga treatment, Plaintiff physician requested lab work to be completed. On March 26, 2021, Plaintiff went to Lab Corp for blood work.

43. While Plaintiff was not getting his needed IGG treatment, Plaintiff's physician and Plaintiff were trying to obtain approval for continuation of his medical care with Panzyga.

Arbitrarily, Defendants indicated that an appeal was needed rather than peer-to-peer review despite the fact that Plaintiff had received IGG treatment as a medical necessity for approximately 6 years.

44.  For weeks, Plaintiff's physician repeatedly submitted requests to continue Plaintiff's necessary Panzyga treatment.  Defendants repeatedly denied receiving the requests.

45. On or about April 16, 2021, Plaintiff frantically tried to get his Panzyga treatment restarted.  Defendants denied Plaintiff's appeal based upon a pretext that Plaintiff's diagnosis was unclear.

46.  On or about April 19, Defendants requested more blood tests to review Plaintiff's pneumococcal blood level.  On April 20, Plaintiff again returned to LabCorp for blood work. Despite Plaintiff's immunocompromised condition, he was forced to sit for hours at the public lab surrounded by strangers with unknown medical conditions.

47.  Although Defendants required Plaintiff to obtain new blood tests at a public lab on April 20, 2021, Plaintiff learned that the Panzyga had been approved through back channels on April 13, 2021.

48.  On April 22, 2021, Plaintiff spoke with a representative from the Defendants' controlled pharmacy and confirmed that the medication was being shipped again after several weeks' delay.  Although the pharmacy, Diplomat/Optimum Rx, confirmed that the medication was approved and being shipped again, Defendant United's representative advised Plaintiff that the request for Panzyga was not yet approved but still pending.

**Plaintiff Suffered Catastrophic Harm As A Direct Result Of Defendants' Misconduct.**

49. Defendants' choice to deny hundreds of claims for medically necessary treatments that its own representatives acknowledged were covered by the Plan, and fully aware of the impact that its denials could have on Plaintiff, has had predictably catastrophic consequences.

50. Although in many cases Defendants eventually reconsidered and paid those claims, Plaintiff had no choice but to forego medically necessary treatment in the interim. For months, Plaintiff went without Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy that United itself had long known was medically necessary. Even since Plaintiff filed this action, Plaintiff has been forced to forego medically necessary treatments, including Massage Therapy.

51. Without regular Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy, Plaintiff's health deteriorated rapidly. Toxins built up in Plaintiff's system and pathogens ravaged his body as his neurotoxicity and CVID went untreated. He suffered severe dehydration, weight loss, cognitive impairments, and general debilitation.

52. As his symptoms progressed, Plaintiff's whole life changed. Plaintiff wound up in the emergency room on or about July 17, 2018 and again on or about November 9, 2018. (Hospitals are incredibly dangerous places for Plaintiff because of his high risk of infection; he only goes when he fears imminent death.) Plaintiff also became unable to care for himself. In around August 2018, Plaintiff moved from Florida to Ohio, where his elderly parents and grandfather live. These relatives have cared for Plaintiff ever since. Plaintiff spends his days in Ohio receiving various medical treatments, and he struggles with everyday tasks like walking, showering, and driving.

53. In addition, Plaintiff now requires additional, costly medical treatments that he did not need before Defendants interrupted his treatments. For example, he is no longer able to process his own waste and requires regular colonics to survive. He now requires Massage Therapy in addition to colonics to flush toxins from his system. His Hepatitis C infection, which had become undetectable for a time, also reemerged. Furthermore, the treatments that Plaintiff has needed all along (Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy) have become less effective than they were before the interruption.

54. Had Defendants instead continued to process and pay Plaintiff's claims throughout 2018 and 2019, consistent with its own actual knowledge that the Plan covered those claims, Plaintiff's health would likely have improved throughout that period. He could still be living independently. He might even be able to work. Instead, as a direct result of Defendants' egregious misconduct, his health has deteriorated, and his finances have been destroyed.

**The Plan Covers Vitamins and Minerals Therapy, IGG Therapy, Hyperbaric Therapy, and Massage Therapy**

55. As Defendants' history of routinely processing and paying Plaintiff's claims for Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy suggests, the Plan clearly covers these services to the extent that they are medically necessary. They are "Covered Expenses" as defined in the SPD, and no exclusion applies.

<u>These Services Are Covered Expenses</u>

56. The Plan broadly covers "non-hospital benefits for medically necessary services you receive from a physician." Exhibit A at 30. Plaintiff receives Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy outside of a hospital. As Defendants have long recognized, these services are medically necessary to treat Plaintiff's conditions. Plaintiff is informed and believes that at times relevant to this action, Plaintiff has received Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy directly from a physician. In addition, Plaintiff is informed and believes that at times relevant to this action, he has received Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy from physician-run facilities.

57. The Plan also covers claims for "medically necessary services or supplies to treat a non-occupational sickness or illness" as long as the expense is "listed in this Covered Expenses section" of the SPD. Exhibit A at 31. Neurotoxicity of the brain, CVID, and Hepatitis C are non-

occupational sicknesses or illnesses. Vitamins and Minerals Therapy, IGG Therapy, Hyperbaric Therapy, and Massage Therapy are medically necessary to treat these conditions in Plaintiff.

58. "Covered Expenses" under the Plan include "Non-Hospital Expenses," or "healthcare services outside of a hospital." Exhibit A at 31. Plaintiff receives Vitamins and Minerals Therapy, IGG Therapy, Hyperbaric Therapy, and Massage Therapy outside of a hospital. For these services, the Plan "pays benefits based on whether you use a network or non-network provider." Exhibit A at 31. There is no other limitation in the SPD on the coverage of such Non-Hospital Expenses.

59. Immediately following the opening paragraph of the "Non-Hospital Expenses" section, the SPD specifies that the Plan "also covers non-hospital expenses for [certain] medically necessary supplies and services when not billed by a facility (such as a physician's office or a free-standing clinic)." Exhibit A at 31 (emphasis added). The "also" in this provision makes clear that the previous paragraph in the SPD confers blanket coverage for Non-Hospital Expenses when billed by a facility (such as a physician's office or a free-standing clinic).

60. The SPD elsewhere confirms that the Plan covers Non-Hospital Expenses that are billed by physicians or facilities run by physicians. As mentioned above, the Plan broadly covers"non-hospital benefits for medically necessary services you receive from a physician." Exhibit A at 30. In addition, the "Facility-Based Services" chart discloses that the Plan covers, among other things, "Outpatient Therapy Services-Facility Based." Id. at 20. Plaintiff's Vitamins and Minerals Therapy, IGG Therapy, Hyperbaric Therapy, and Massage Therapy are all "Outpatient Therapy Services." Thus, they are all covered Non-Hospital Expenses under the Plan to the extent that the Plan views Plaintiff's healthcare providers as "facilities."

61. In addition to the Plan's blanket coverage of Non-Hospital Expenses administered by facilities, the SPD clarifies in numerous places that the Plan covers Vitamins and Minerals

Therapy, IGG Therapy, Hyperbaric Therapy, and Massage Therapy, no matter who administers them. These services are specifically covered when provided by "non-facilities," by "convalescent or skilled nursing facilities," by "an approved home healthcare agency," or by "physical therapists." In short, the Plan covers Plaintiff's various medically necessary treatments no matter how Plaintiff's actual providers are characterized.

62. For example, the SPD specifies that the Plan covers the following "medically necessary services when not billed by a facility," among others:

> a. "Drugs maintained and administered in the physician's office." Exhibit A at 31. This provision specifically covers Plaintiff's IGG Therapy.
>
> b. "Oxygen and rental of equipment for its administration." Exhibit A at 31. This provision specifically covers Plaintiff's Hyperbaric Therapy.
>
> c. "Therapy services, including radiation therapy, chemotherapy and dialysis, when not billed by a facility." Exhibit A at 31. This provision specifically covers Plaintiff's Vitamins and Minerals Therapy, IGG Therapy, and Hyperbaric Therapy.

To the extent that Plaintiff's healthcare providers are not "facilities" within the meaning of the Plan, these specific provisions apply.

63. The SPD also specifies that the Plan covers "Convalescent and Skilled Nursing Facility Care." Exhibit A at 32. These are "benefits for medically necessary convalescent and skilled nursing facility expenses as long as: The services are recommended by the attending physician and you remain under the care of a physician; You need the skilled nursing services and physical restorative services to recover from an injury or disease; and The facility is not primarily a rest home, educational institution, custodial facility or similar institution." Id. Where, as here, these criteria are met, the Plan covers the following as Non-Hospital Expenses:

a. "Oxygen and other gas therapy." Exhibit A at 32. This provision covers Plaintiff's Hyperbaric Therapy.

b. "Drugs, solutions, dressings, biologicals and casts." Exhibit A at 32. This provision covers Plaintiff's Vitamins and Minerals Therapy and IGG Therapy.

c. "Other related medical services customarily provided to patients." Exhibit A at 32. This catch-all provision covers all of Plaintiff's therapies.

To the extent that Plaintiff's healthcare providers are convalescent or skilled nursing facilities, these provisions apply.

64. The Plan also covers home healthcare services that are prescribed by physicians and provided by an "approved home healthcare agency." Exhibit A at 33. Where, as here, these criteria are met, the Plan covers "medical supplies, drugs, prescribed medicines and laboratory services." Id. This provision covers Plaintiff's IGG Therapy. To the extent that Plaintiff's healthcare providers are home healthcare agencies, this provision applies.

65. And the Plan also covers "Physical Therapy," meaning "benefits for services performed by a physical therapist to provide medically necessary rehabilitative treatment that improves or prevents further deterioration of a bodily function that has been lost or impaired through a disease or injury." Exhibit A at 34. The Physical Therapy provision covers Plaintiff's Hyperbaric Therapy and Massage Therapy.

66. In short, the Plan provides blanket coverage of Non-Hospital Expenses administered by facilities, including each therapy or medication at issue here. The Plan separately specifies that it covers Plaintiff's various therapies and medications when they are not administered by facilities. No matter how the Plan characterizes Plaintiff's healthcare providers, these services are covered.

<u>No Exclusion Applies to These Services</u>

67. The SPD provides that certain medical expenses are "Not Covered" by the Plan. See Exhibit A at 38-39. There are only two arguably relevant exclusions:

> a. "Massage therapy unless provided under the supervision of a licensed physical therapist or other eligible provider for medically necessary treatment as determined by the Claims Administrator." Exhibit A at 38.
>
> b. "Vitamins, minerals, food supplements, dietary or nutrition counseling of any kind, unless it is specifically mentioned as covered or determined medically necessary by the Claims Administrator." Exhibit A at 39.

Neither exclusion applies here.

68. The massage therapy exclusion does not apply because Plaintiff's Massage Therapy is provided under the supervision of a licensed physical therapist or other eligible provider. In addition, when Defendants adjudicated Plaintiff's claim for Massage Therapy, Defendants did not deny the claim on the basis that Massage Therapy is not medically necessary for Plaintiff. Indeed, Defendants have never suggested that Massage Therapy is not medically necessary for Plaintiff, nor could it.

69. The nutrition exclusion does not apply because the Claims Administrator has determined that Vitamins and Minerals Therapy is medically necessary. The nutrition exclusion also does not apply because various provisions of the SPD specifically mention Vitamins and Minerals Therapy as covered. See, e.g., Exhibit A at 32 (covering "[d]rugs, solutions, dressings, biologicals and casts" administered by convalescent and skilled nursing facilities).

**Count One - Claim for Benefits Against Defendants HCA Plan Administration Committee and Defendant HCA, Inc. - ERISA, 29 U.S.C. § 1132(a)(1)(B)**

70. Plaintiff realleges all preceding paragraphs of this Complaint as if fully set forth below.

71. Defendants have absolute discretion to deny the benefits at issue in this Complaint and to make final and binding decisions as to appeals of those denials.

72. Defendants denied covered claims for Vitamins and Minerals Therapy, IGG Therapy, Hyperbaric Therapy, and Massage Therapy.

73. Plaintiff seeks to recover these benefits due under the terms of the Plan which were denied and/or delayed by Defendants.

**Count Two – Claim for Benefits Against Defendant United Healthcare Services, Inc. – ERISA, 29 U.S.C. § 1132(a)(1)(B)**

74.  Plaintiff realleges all preceding paragraphs of this Complaint as if fully set forth below.

75. Defendant has absolute discretion to deny the benefits at issue in this Complaint and to make final and binding decisions as to appeals of those denials.

76. Defendants denied covered claims for Vitamins and Minerals Therapy, IGG Therapy, Hyperbaric Therapy, and Massage Therapy.

77.  Plaintiff seeks to recover these benefits due under the terms of the Plan which were denied and/or delayed by Defendant United Healthcare Services, Inc. since January of 2021.

**Count Three – Breach of Fiduciary Duty Against Defendants HCA Plan Administration Committee and HCA, Inc.**

78.  Plaintiff realleges all preceding paragraphs of this Complaint as if fully set forth below.

79.  As Plan Administrator and/or de facto Plan Administrator, Defendants were fiduciaries of Plaintiff and owed Plaintiff a fiduciary duty.

80. Defendants breached their fiduciary duty throughout the administration of the Plan during the COBRA period by arbitrarily denying and delaying treatment that was medically necessary for Plaintiff.

81. Defendants further breached their fiduciary duty throughout the administration of the Plan during COBRA period by inexplicably failing to authorize IGG therapy that had previously been authorized.

82. Defendants further breached their fiduciary duty throughout the administration of the Plan during the COBRA period by denying IGG therapy and other treatment on the grounds that Medicare was the primary payor when Defendants knew that they were the primary payor and, at the same time, Defendants knew or should have known that Plaintiff was ineligible for Medicare Part B coverage.

83. Defendants further breached their fiduciary duty when they wrongfully informed Plaintiff's medical providers that he was Medicare-eligible due to ESRD when Defendants knew or should have known he did not have ESRD.

84. Defendants further breached their fiduciary duty when they attempted to pay Medicare rates and/or "out-of-network" rates, leaving large amounts due to Plaintiff when Defendants had no right to pay adjusted rates.

85. Defendants further breached their fiduciary duty to Plaintiff when they knowingly paid less than the amounts they were obligated to pay, leaving Plaintiff with balances for covered treatments.

86. Defendants further breached their fiduciary duty to Plaintiff when they wanted Plaintiff to switch from Panzyga to a less-expensive IGG Therapy although Panzyga was his authorized

IGG Therapy and caused Plaintiff to obtain unnecessary blood tests that put him at risk as an immunocompromised individual.

87.  Defendants' breaches of their fiduciary duties caused Plaintiff to suffer irreparable injury and catastrophic losses. ERISA does not otherwise provide an adequate remedy for these harms.

88. Plaintiff seeks "other appropriate equitable relief" to redress Defendants' violations of ERISA. Such other appropriate equitable relief may include, but is not limited to, the imposition of a constructive trust, restitution, disgorgement of Defendants' profits, and surcharge.

**Count Four – Violation of the Americans with Disabilities Act of 1990, as Amended**

89.  Plaintiff realleges all preceding paragraphs of this Complaint as if fully set forth below.

90.  Plaintiff suffered from a disability while he was a beneficiary of the Plan that caused him to have electro magnetic sensitivity.  During that time, Plaintiff requested a copy of the SPD from Defendants.  Defendants failed to accommodate Plaintiff in providing a copy of the SPD by mail and told him to view it online.

91.  Since Defendants failed to accommodate Plaintiff by providing the SPD by mail initially, Defendants violated the Americans with Disabilities Act of 1990.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

a. For all benefits owed under the Plan;

b. For an injunction, from delaying or denying payment of any future claims for Vitamins and Minerals Therapy, IGG Therapy, Hyperbaric Therapy, or Massage Therapy;

c.  For reformation of coverage;

d.  For disgorgement of Defendants' profits;

e.  For removal of Defendants as Plan Administrator;

f. For monetary relief in an amount to be proven at trial;

g. For all attorneys' fees and costs incurred in bringing this action;

h. For pre-judgment and post-judgment interest;

i. For all other relief the Court deems appropriate, proper, and just.

Respectfully submitted,

*/s/ John B. Stalzer*
John B. Stalzer (#0074371)
STALZER LAW
20714 Stratford Avenue
Rocky River, OH 44116
Akron, OH 44333
T: (440)578-7727
E: jstalzer@stalzerlaw.com

## **JURY DEMAND**

The Plaintiff demands a trial by jury of the maximum number allowed by law.

/s/ John B. Stalzer

John B. Stalzer (#0074371)
STALZER LAW